The first case on the argument calendar this morning, and I'm not sure I'm going to pronounce it correctly, Tsoyi v. Holder. Good morning, Your Honors. Vadim Zapolsky, attorney for Valeri Tsoyi. How do you say it again? My name or the. No, not your name. The name of the Tsoyi. Tsoyi. Tsoyi. Thank you. Thank you, Tsoyi Milton. OK. This case is based on a credibility finding. The immigration judge basically found the respondent not credible based on an error on a document that was submitted, an error in dates in the testimony. And then when the respondent tried to correct the document through his wife who obtained a corrected version to his homeland, the judge refused to admit it. Don't we really just have a we have a clash between the Tickle and the Morgan cases as two different approaches? Isn't that what we're dealing with here? I'm not familiar with the findings in those cases. Well, in effect, Morgan says that if what the BIA says is illustrative and not exhaustive, that we're able to go into the record and see what the what the IJ found and make our own determination. Tickle says that if the if the BIA makes a references, then that is, in fact, its best case. And we have to rely upon that. Are you familiar with either of those concepts, if not the cases? I'm not familiar with the cases. But, Your Honor, in this case, the BIA made a decision based on the judge's finding, which I thought was wrong. There was a due process violation in not admitting the corrected version of the document. And he didn't even allow the respondent to read it into the into the record. After the judge saw an inconsistency, the respondent's attorney tried to have him read the document in Russian. And the judge wouldn't even allow him to do that. Are you suggesting that in any proceeding before the immigration judge, that any time that the petitioner wants to admit a document that that has to happen or the whole thing gets thrown out? No. This case, what I am suggesting is when there's a negative credibility finding, the petitioner has to have a chance to rebut it. Yeah, but I think you and I have a slightly different view of what happened. My recollections to what happened in front of the IJ was he testifies as to different dates than are on the document. Correct. Then his lawyer and I gather you're now a different lawyer. I am. His lawyer tries to put that document in front of him so that he can read from it in Russian and the Cyrillic alphabet. And IJ says, no, we have an official translation. I'm not going to let you do that. But that's from the original document. Then later, the so-called corrected document comes in. So it's not that he didn't let him read from the corrected document. No, he didn't even admit the corrected document. He didn't let him read from the original document. Correct. Correct. And it wasn't an issue with the dates. If I testified that I went to the hospital in June and then July and then I switch it to May and then I say June, that's not an issue. The issue here, the dates have never been a basis to find adverse credibility. Well, what's bothering the IJ, and I think the same thing is bothering the BIA, is he thinks it's a fraudulent document. What basis does the BIA or the IJ have? Well, partly it's the dates don't match the story that he had. And then when he's pushed to it, he then goes back to the June date that's apparently on the on the document. But there's also apparently a mistake in terms of employment. The document says he's employed as the engineer when, in fact, he hadn't been so employed for two years at the time the documents ostensibly prepared. I understand. And the mistakes in employment, the first time that ever came up is when the judge issued a decision. He didn't even ask the petitioner about it in court. That was the first time that was brought up. You've got to at least ask him why it was in there. The petitioner was allegedly brought in the hospital for a head injury. Who knows what state he was in? Who knows who provided this information to the hospital staff? No, giving him an opportunity to respond on that one, I take it. And that's all we wanted. And that's the basic. If the petitioner went back and forth between June or July, that's not the issue. The issue was that the petitioner was adamant. I stayed in the hospital for two weeks. That was the issue. Two weeks. But the document had him in the hospital for six weeks. Now, that's the issue. If I go May or June or June, July, that's not an issue. But the fact that the document says that he was in the hospital for six weeks, when he clearly testified it was only two weeks and he would not change his testimony. That was the issue. And that's why. And the attorney was confused at the trial. He wasn't sure if it was a translation issue or a document problem. So he tried to have the respondent read it in Russian. The judge wouldn't allow it. But counsel, isn't it the essence of a trial judge, as the I.J. was in this case, isn't the essence of that person's function to be able to observe the demeanor of the witness, take into account any inconsistencies and draw conclusions from that? The I.J. was really clear that he thought that the, and I'm quoting here, he generally appeared confused as a witness, unable to recall specific details of his alleged period and period of incarceration and mistreatment. And that his testimony about the police was, in quotes, vague and lacking in detail. Now, doesn't that go to the heart of the case? Please. Well, there's two different issues. There's inconsistency as to the periods of duration, which is a time issue, which is a date issue, which has never been a basis to find adverse credibility. And then there's the demeanor. And when he did the demeanor finding, he didn't, the demeanor went to the time of incarceration. The demeanor, the key was that he went back and forth as to this issue of dates. Well, no, the demeanor's broader than that. In fact, the I.J. specifically says, and I encourage you to listen to the tape when he tries to introduce the so-called corrected version. So, no, his demeanor and sort of manner of presentation goes throughout. Well, if I may respond? Please. When he said, listen to the tape about the corrected version, that's when he tries to hang his hat on the chain of custody issue. But he had no reason to do that. The respondent said, I don't drive. There's the pastor who's in the court sitting next to me. He's got the document. You're not taking my point. I think his, I think the I.J.'s statements as to demeanor go not merely to the July, June disparity, but throughout. In fact, if you read the transcript, you can see that there's great difficulty getting him to answer the questions, not difficulty in the sense of answer the question truthfully so much as question is asked, he gives an answer that's totally nonresponsive. Same question asked again, another answer that's totally nonresponsive. If I may respond, I've been doing immigration law for 13 years. There's different language barriers. There's the man is, even though he's an engineer, he's nervous. He's in front of a court. There's tons of issues that could explain this. He never, and I.J. never pointed to anything specific. He just threw that out as a boilerplate demeanor finding. Yeah, yeah, I know. What do we do with the I.J.'s saying, you know, he says, you know, if this really happened to you as you say it did, your behavior doesn't make any sense to me. I'm now paraphrasing the I.J. He says, you were beaten on two separate occasions. Then you come to the United States, to Florida to study this hands-on healing process. Then you go back. Then you practice this hands-on healing. Then you come to the United States again. And almost a year after you've been in the United States for the second time, your wife has never come with you. Your wife has gone back and forth between Russia and Uzbekistan. You finally apply for asylum. He says, you're a fairly sophisticated man. You're educated as an engineer. It just doesn't, I just don't believe that you finally discover that asylum is available in the United States. And you finally, after almost a year is up in your second visit, you finally apply. Judge, that's a lot of issues, but I will address them. But what I'm saying is, he says that story just doesn't make any sense to me. Okay. That's the judge putting himself in the respondent's shoes. There's no reasonable explanation of what someone is willing to do to be with family. Firemen go into burning buildings all the time for strangers. But his family's gone to Russia and he hasn't. Well, he didn't believe that they would be able to obtain a visa to come here. First of all, but- Years have passed. He doesn't seem to have followed his family, so it's a little hard to understand how he's running into a burning building if he won't go to Russia for them. Well, he came here, and he came to study Reiki, and then he went to be reunited with his family. He didn't want to be apart from his family. And then he came back here, his family went elsewhere, and he didn't rejoin his family. So you're telling me he's willing to go to Uzbekistan to be with his family, but he's not willing to go to Russia? I don't know what his future plans were. He had his family leave Uzbekistan, and they went to Russia. Unfortunately, they could not obtain any permanent residence there, and they returned to Uzbekistan. But it's not for me to put myself in the mindset of the respondent. I would be guessing as to why and what he would be thinking. And I don't think that's permissible. But it's his burden, is it not, counsel? He has the burden to show the points that are required in order to claim asylum and the other things he was seeking. Your Honor, I believe he has met his burden by credible, consistent testimony. If his testimony is credible, then he has met his burden. If we undermine it with putting ourselves in issues, why didn't he go to Russia? Why didn't he bring his family here? Why didn't he do that? That undermines what I believe is credible testimony. Okay, I think we've got your argument in hand. Let's hear from the government. You've got 15 seconds left, but we'll make sure you get an adequate time to respond. Thank you, Judge. Good morning, Your Honors. Ann Wellhoff, a respondent, United States Attorney General Holder. May it please the Court. The sole issue before this Court today is whether or not the decision of the agency that petitioner was not credible is grounded in substantial evidence. Can we start out with the question that Judge Smith asked, which is to say, for purposes of sustaining or not sustaining the adverse credibility finding, are we restricted to the ground or grounds given by the BIA? Or may we look to the grounds in addition that the IJ talked about that the BIA did not talk about? Your Honor, I believe that this Court may look to both decisions. And I would note that- Because? I'm sorry? Because? Because the, while there wasn't a specific explicit adoption of the IJ's decision in this case, the board clearly agreed with the immigration judge and adopted his reasoning while adding his own commentary. And I believe it's appropriate for the Court to look to both decisions in order to find the substantial evidence that grounds the agency's decision here. But how do you deal with Teckle? Teckle says that when the BIA has identified specific reasons articulated by the IJ as the basis for its decision, that we review only those reasons articulated by the BIA. Well, I believe that the BIA gave, used language, even for example, it bought off wholesale on the immigration judge's decision, but and pointed out specific things, for example, as illustrative of the reasoning that it was agreeing with. I do believe, though, that the Court may still review both decisions. Not based on Teckle? Correct. So you're suggesting then that Morgan is the controlling case here? Well, Your Honor, I believe that when the immigration judge, because the reasoning that he gave was agreed with by the immigration, or by the board, excuse me, that the court may look to, to the extent it needs to, understanding the board's conclusions, may look through to both decisions, which were both consistent and agreed, and the board did agree with the immigration judge's findings. I also believe, to the extent the court only wants to look at the board's decision, that, again, substantial evidence is found in the immigration, in the agency's reasoning. And there's been a lot of discussion in the opening about those corrected medical records, and I'd like to, I'd like to address that. The immigration judge did mark them for identification, but did not admit them into evidence. And that was entirely proper. While an alien has an opportunity to present evidence in his own behalf, the immigration judge is the trier of fact and the admitter of evidence, has to look to the probative value of the evidence, as well as whether it's fundamentally fair to admit that evidence. As the court reviews the record, I would point out, administrative record, pages 134 through 136, the immigration judge engaged in an extensive discussion with the petitioner about both the generation of these documents, as well as how he came in possession of these documents. And the exchange reveals that these documents are utterly lacking in authenticity and credibility. Basically, petitioner's story is that only, and only after he's confronted with material inconsistencies between his testimony and his corroborated evidence, only at that point does petitioner back away and claim the medical records are wrong. And, again, he wasn't claiming there was an improper translation. His testimony and his position before the board was that, oh, the hospital put the wrong dates. So he wants the court to believe that he just called his wife up in a rush and said, hey, I got this problem here. Can you go over to that government-run hospital, the very hospital that I went to after being persecuted and beaten by that government, explain the situation to them, have them fix it all up for me, and send the documents over. And that's exactly his testimony. I would refer the court to, I mean, it was just that simple. Administrative record at page 134. This is what petitioner said. I called home, and my wife went to the hospital. She explained all the situation. So they opened their archives, and they fixed it all up there. That very government that's persecuting him, she just explained he needs his asylum case to be believable here in the U.S. Could you fix the documents? Wait a minute. He didn't say that she said that. Well, she explained all the situation. I assumed the situation would be this. All the situation doesn't necessarily mean that he's applying for asylum from the evil government of Uzbekistan. You're correct. But I would, I believe it's inferred if she's explained the situation. Don't overstate the case. Thank you. Anyway, so then she gets it. They pull the documents, and this all happens in fairly record speed, in less than one month between the time of his hearing and the next date, the immigration judge has said, and the documents make their way to the United States by some unknown individual, not through any, you know, conventional mail or means that can be traced and verified. Once they get here, an unknown individual then delivers them to another individual, and that individual then gives them to the petitioner. And the immigration judge looked at all that and determined that. Now, my understanding is that the individual who, the woman who finally receives them is there in the courtroom. That is correct. And that is the same individual that translated the first documents which petitioners claiming were in error. But I think it's important. And why is that a suspicious circumstance that she was also a translator? She was a translator. Yes. Why is that a suspicious circumstance? I won't, I won't overstep the record either. And I won't say that, but I would point out that the petitioner did not allege before the board that the translation was in error. In fact, he used the same translator to translate the second set of documents. I would just point out that, to me, emphasizes the translation wasn't the problem. His position was that the hospital recorded the wrong case. Should the IJ have allowed, the woman who I gather is both the translator and the pastor, should the IJ have allowed her to testify as to who she got it from and so on? Because we're getting just testimony from the petitioner here who, according to his testimony, well, I don't know. I mean, she's the one who got it. I never saw the guy. Well, and again, petitioner didn't offer her as a witness. Did he have an affirmative obligation to ask for her to come up? I don't believe so. I believe that he did conduct enough of a background inquiry to decide whether these documents were probative and fundamentally fair. And given the testimony, the immigration judge decided that the documents were not either worthy of admission or weight. It's a little bit unclear, but it doesn't appear. I want to be sure I understand. You're saying that the petitioner did or did not make a proffer of this woman's testimony? I do not. I checked the record, and I did not see a proffer of that woman's testimony. I do know that the immigration judge said, is she in the courtroom? And the answer was yes. I didn't see a proffer of her. And the IJ, and again, I can't go beyond what I recall, but the IJ's order says there was an offer of proof referring to what she was going to say. Now, what that means in the sense of what precisely was offered, whether there was an attempt to get her to testify, I don't know. I didn't see an offer of her as a witness, and I didn't read it as an offer of proof, Your Honor. If I'm mistaken, I would apologize to the court. Oh, I know what the IJ said, and beyond that, I don't know. Okay, yeah, I didn't recall an offer of proof on the testimony, either, but the court can certainly review that. So, but, and I would also point out that in addition to the material inconsistencies that do go to the heart of petitioner's claim, the very event that prompted and spawned him to leave the country and leave his family, and the extent of the time that he spent in the hospital, that is material and goes to the heart of his claim. But in addition to the agency citing that as substantial evidence to support the decision, as Your Honors have noted this morning, they also noted several implausibilities in petitioner's version of events, and that is another proper basis upon which an adverse credibility determination may be made. The immigration judge in the agency is entitled to weigh the plausibility of the Crawford story, and the agency found it implausible that he would be, in 1998, beaten to the point of a near-death experience. That was his testimony. Notwithstanding that horrible near-death experience, he comes to the United States to study for approximately one year, and then he goes back to Uzbekistan. Even after that point, he obtains a passport from the country, the very country that he claims is persecuting him, considering him a dissident. The country was willing to issue him a passport and any protections that go along with having that passport. The immigration judge found that to be implausible. And that's not speculation. That's drawing reasonable inferences from evidence, which any trier of fact, it's incumbent upon them to do. It's not speculation about what somebody would have done or should have done, as in the cases that Petitioner cited on brief. The line between reasonable inference and speculation is a terribly difficult line. And I've come to the conclusion that the difference is if I believe it, it's reasonable, and if it's not, I don't believe it is speculation. Well, Your Honor, I believe that a trier of fact has to weigh the testimony. And in fact, by regulation, the immigration judge has to decide the plausibility of the evidence. He can grant asylum based solely on testimony if it's consistent and plausible. So that is part of the weighing of the evidence that the agency engaged in here. And there were several. Okay, your time's up. Do you have a quick summary? Quick summary that Petitioner has pointed to absolutely no evidence in this record that would compel a finding contrary to the agency. And the agency's conclusion that Petitioner was not credible based on numerous inconsistencies and implausibilities in Petitioner's testimony. And the Court should deny the petition for review. Okay, thank you. Thank you. Would you like a minute to respond? Yes. Counsel Plano, it's only at that point did he correct his document. First of all, he didn't know his document was wrong. That's when it came up. And as far as this string, he read his own document. Judge, I have no idea why his attorney didn't prep him, why he didn't review the documents. I saw nowhere in the record where the judge asked him, did you review the supplemental documents? I saw that they asked him, did you review the contents of the application? But why he didn't review the document, I have no idea. But at the end, at the final hearing, the judge asked him, and you're saying that these medical documents you filed in court, that was Ms. Raffer-Covert that provided those to you? The respondent goes, yes, yes. And he just goes, to the oral tape, to the tape for the oral decision. So he didn't want to hear from this woman. He didn't want the respondent to get this document in. And as far as this whole business about the passports, why they issued him a passport, he didn't read his own country report. The country report says they no longer do this. He says, in the past, they denied passports, but there were no instances of this this year. And I rest on that. Thank you. Thank both sides for their helpful argument. The case of Sawyer v. Holder is now submitted for decision. The next two cases on the calendar have been submitted on the briefs. That's the United States v. Sutton and the United States v. Libman. The next case on the argument calendar is, well, are two consolidated appeals, United States v. Richard Berger and United States v. Cornella Berger.
judges: Fletcher W. , Fisher, Smith M.